**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CAYUGA NATION, a federally recognized Indian Nation; | ) ) ) | Civil Action No. 5:26-cv-1241 (ECC/ML) |
| *Plaintiff*, | ) ) | |
| v. | ) ) | **COMPLAINT FOR DECLARATORY RELIEF AND MONEY DAMAGES** |
| AMERICAN WAGERING, INC. d/b/a CAESARS SPORTSBOOK, | ) ) ) | |
| *Defendant*. | ) ) | **DEMAND FOR JURY TRIAL** |
| | ) | |

Plaintiff Cayuga Nation (the "Nation"), as and for its Complaint against the above-named Defendant, hereby allege as follows:

**<u>INTRODUCTION</u>**

1.      This is an action brought by the Cayuga Nation (the "Nation") against the Defendant American Wagering, Inc. d/b/a Caesars Sportsbook ("Caesars" or "Defendant"), for engaging in illegal gaming on the Nation's Reservation in direct violation of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq. ("IGRA") and the Nation's Gaming Ordinance ("Ordinance"). These federal and Nation laws prohibit the type of gaming conducted by Defendant Caesars within the Nation's 64,015-acre federally recognized Reservation (the "Reservation").

2.      Despite clear statutory mandates, Defendant conducted gaming within the Reservation without the Nation's authorization, approval of a Tribal-State compact, or oversight by the National Indian Gaming Commission ("NIGC") or the Secretary of the Interior, as required by IGRA. Through Defendant's applications and servers licensed by the New York State Gaming Commission, Defendant accepted wagers placed from physical locations within the Reservation's boundaries, including wagers from users who are present on Indian lands as defined in 25 U.S.C. § 2703(4).

3.      By unlawfully operating within the Nation's territorial boundaries under color of state law, Defendant ignored the basic tenets of federal preemption, usurped the Nation's exclusive jurisdiction to regulate gaming on its lands, and deprived the Nation of the governmental and economic benefits Congress intended IGRA to secure.

4.      The Nation therefore brings this action seeking declaratory relief and damages against the Defendant for engaging in illegal gaming within the Reservation.

## **PARTIES**

5.      Plaintiff Cayuga Nation is a federally recognized Indian nation.  *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 88 Fed. Reg. 54,654, 54,655 (Aug. 11, 2023).  The Nation is governed by the Cayuga Nation Council.

6.      Defendant Caesars is a Nevada corporation registered to do business in New York, with a principal place of business of 1 Caesars Palace Drive, Las Vegas, NV, United States, 89109.

## **JURISDICTION AND VENUE**

7.      This Court's jurisdiction over the Nation's claims is based upon the following:

(a)      28 U.S.C. § 1331, in that this action arises under the Constitution, laws, or treaties of the United States, specifically, IGRA, the Lanham Act, 15 § 1051 *et seq.*, and the federal common law;

(b)      28 U.S.C. § 1362, in that the district courts have original jurisdiction of all civil actions brought by any Indian nation or band with a governing body duly recognized by the Secretary of the Interior ("Secretary"), wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States;

(c) 28 U.S.C. § 2201, in that Plaintiff is moving under the Declaratory Judgment Act; and

(d) This Court has federal question jurisdiction because the Complaint alleges ongoing violations of the Nation's Reservation rights pursuant to federal law, including the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*, which affirms federal authority and Indian Nation sovereignty over gaming on Indian lands.

8. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, in that:

(a) Defendant conducts business within this District; and

(b) A substantial part of the events or omissions giving rise to the Nation's claims occurred in this District.

## GAMING ON INDIAN LANDS PURSUANT TO THE INDIAN GAMING REGULATORY ACT

9. By way of background, for the majority of this Country's history, gambling on sports has been illegal under federal law and the laws of most states for both moral reasons and to ensure that sporting events are fair and free from gambling-related corruption. In 1992, Congress enacted the Professional and Amateur Sports Protection Act, 28 U.S. Code § 3701 *et seq.*, which purported to bar the States (other than Nevada and New Jersey) from authorizing sports betting. In 2018, however, the Supreme Court struck down that Act, recognizing that "Americans have never been of one mind about gambling[,]" and holding that Congress could not lawfully impose such a barrier on state lawmakers. *Murphy v. NCAA*, 584 U.S. 453, 458 (2018). Since then, most states have legalized sports gambling through licensing and registration regimes that generate much needed tax dollars for states and, typically, require bettors to be 21 years old to place sports

bets. Indian tribes, too, have begun to offer sports gambling on their reservations in those states where, consistent with IGRA, the state permits such gambling under state law.

10. In 2025, the gaming industry shifted significantly. Currently, 18-year-old high school students across the United States, including some that are located on Indian reservations, are on their phones placing bets on the outcome of virtually every sporting event occurring across the globe, without any regulation of that betting by states or Indian tribes and the protective measures related to corruption and problem gambling imbedded in such regulatory schemes, in contravention of federal, state, and tribal law.

11. Courts have long recognized that Congress has "exclusive authority" over Indian affairs. This exclusive authority is rooted in the Indian Commerce Clause (art. I, § 8, cl. 3) and the Supremacy Clause (art. VI, cl. 2) of the Constitution, which gives Congress "the exclusive and absolute power to regulate commerce with the Indian tribes, — a power as broad and as free from restrictions as that to regulate commerce with foreign nations." *United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 194 (1876); *Worcester v. Georgia,* 31 U.S. 515, 551-57, 558–60 (1832); *Seminole Tribe v. Fla.*, 517 U.S. 44, 62 (1996).

12. The Indian Commerce Clause authorizes Congress "[t]o regulate Commerce . . . with the Indian Tribes." Art. I, §8, cl. 3. The United States Supreme Court has interpreted the Indian Commerce Clause to reach not only trade, but certain "Indian affairs," as well. *Cotton Petroleum Corp. v. New Mexico*, 490 U. S. 163, 192 (1989).

13. The Supreme Court does not treat the Indian Commerce Clause as interchangeable with the Interstate Commerce Clause. Unlike the Interstate Commerce Clause, where States retain "some authority" over trade, the Supreme Court has ruled that "virtually all authority over Indian

commerce and Indian tribes" lies with the Federal Government.  *Seminole Tribe of Fla.*, 517 U. S. at 62.

14.    From this exclusive authority the Supreme Court has held that there arises and exists a trust relationship between the United States and the Indian tribes that informs and restrains the Congressional exercise of legislative power.  *United States v. Mitchell*, 463 U. S. 206, 225-26 (1983).  Pursuant to this trust relationship, the Federal Government has "'charged itself with moral obligations of the highest responsibility and trust'" toward Indian tribes.  *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011) (quoting *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942)).

15.    Based upon the trust responsibility owed to Indian nations by the United States, courts presume that when Congress legislates on Indian affairs, its intent towards the nations is benevolent and federal statutes that arguably would abrogate or abridge tribal rights to self-government are narrowly construed in favor of the nations retaining them.

16.    For this reason, the Supreme Court has adhered to "the general rule that statutes passed for the benefit of the dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Montana v. United States*, 450 U.S. 544, 573 n.8 (1981).

17.    Applying these canons of statutory construction, the Supreme Court in *California v. Cabazon Band of Indians*, 480 U.S. 202 (1987) ("Cabazon"), held that California had no authority to enforce its gambling laws against Indian nations on their Indian lands. *Cabazon*, 480 U.S. at 221-22.

18.    In response to the *Cabazon* decision, Congress enacted the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, to create a framework for Indian nations, states, and the federal government to exclusively and comprehensively regulate tribal gaming on "Indian lands."

19.    The purpose of IGRA, set forth in 25 U.S.C. § 2702, is:

> (1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.
>
> (2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and
>
> (3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

18.    Under IGRA, if the gaming activity is not specifically prohibited by Federal law and is conducted within a state which does not, as a matter of criminal law and public policy, prohibit such gaming activity: (1) Indian nations and the NIGC have the **exclusive** right to regulate class II gaming on Indian lands; and (2) the Indian nations and the states, pursuant to a compact, have the **exclusive** right to regulate class III gaming on Indian lands. 25 U.S.C. § 2701(5) (emphasis added).

19.    IGRA defines "Indian lands" as "all lands within the limits of any Indian reservation"; and "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual Indian or held by any Indian tribe or individual subject to a restriction by the United States against alienation and over which an Indian tribe exercises governmental power."  25 U.S.C. §§ 2703(4)(A)-(B).

20.     IGRA established a statutory framework for the regulation of Indian gaming, which "expressly preempts the field of governance of gaming activities on Indian lands." *Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284, 1289 (D.N.M. 1996) (quoting S. REP. No. 100-446 at 6).

21.     IGRA divides Indian gaming into three classes, with different regulatory requirements for each class.

22.     Class I gaming consists of traditional tribal games for prizes of minimal value connected with tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Class I gaming is within the exclusive regulatory jurisdiction of the nations.

23.     Class II gaming consists of bingo, "whether or not electronic, computer, or other technological aids are used in connection therewith," including "pull tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo." 25 U.S.C. § 2703(7)(A)(i). Also included in class II gaming are non-banked card games either explicitly authorized by state law or not prohibited by state law and played in conformity with state regulations regarding hours of play and limits on wagers and pot sizes. 25 U.S.C. § 2703(7)(A)(i)-(ii) and (7)(B).

24.     Class III gaming is defined as "all forms of gaming that are not class I gaming or class II gaming." 25 U.S.C. § 2703(8), which includes sports gambling.

25.     Class III gaming can be the most lucrative form of gaming. It includes the games played in a typical casino in Las Vegas, such as slot machines, craps, roulette, and house banked and percentage card games, like blackjack (21).

26.     The federal regulations adopted by the NIGC, which implement IGRA, specifically state that class III gaming includes "[a]ny sports betting and pari-mutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai." 25 C.F.R. § 502.4(c).

7

27.     While federal regulations define class III gaming as including all house banked games, 25 C.F.R. § 502.4(a), the regulations separately state that sports betting constitutes class III gaming without reference to whether the wagering is house banked. 25 C.F.R. § 502.4(c).

28.     Under IGRA, in order for class III gaming to be conducted on Indian lands: (1) the Indian nation must have adopted a tribal ordinance that authorizes the playing of the class III games and the ordinance must have been approved by the Chairman of the NIGC (the federal regulatory agency created under IGRA); (2) the state in which the class III gaming will be conducted must "permit" such gaming for any purpose by any person, organization, or entity; and (3) the class III gaming must be conducted in conformance with a Tribal-State compact entered into by the Indian nation and the state, pursuant to IGRA. 25 U.S.C. § 2710(d)(1).

29.     In order to go into effect, a Tribal-State class III gaming compact must be approved by the Secretary, 25 U.S.C. § 2710(d)(8)(A), or deemed approved by operation of law, 25 U.S.C. § 2710(d)(8)(C), and notice of approval must be published in the Federal Register, 25 U.S.C. § 2710(d)(3)(B).

30.     Gaming conducted by any person or entity on Indian lands that is not authorized by a Tribal-State class III gaming compact violates IGRA and federal and state criminal law. *See* 25 U.S.C. §1166 (applying "all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions" to Indian country). *See also Coeur D'Alene Tribe v. State*, 842 F. Supp. 1268, 1282 (D. Idaho 1994) ("Accordingly, the court finds that in the absence of a tribal gaming ordinance and a compact, neither the Tribe nor any non-tribal entity . . . may conduct Class III gaming on the reservation.").

31.     Any class II or class III gaming conducted by a third party management company on Indian lands on behalf of an Indian nation with a compact must meet the strict requirements of IGRA,

8

25 U.S.C. § 2710(d)(9) and 25 U.S.C. § 2711, in order to conduct that gaming. Further, any contract authorizing a third-party management company to conduct gaming on Indian lands on behalf of a nation must be approved by the Chairman of the NIGC. *See* 25 U.S.C. § § 2710(d)(9), 2711; *see also* 25 C.F.R. § 533.

32.     IGRA provides nations an enforcement mechanism to prevent gaming from being conducted on Indian lands that is not authorized by a Tribal-State compact. S*ee Ho-Chunk Nation v. Kalshi Inc*., No. 25-cv-698-wmc, 2026 LX 293205, at *14-22 (W.D. Wis. May 11, 2026).

33.     Legislative history reinforces this understanding. During Senate debate, members repeatedly emphasized that states could acquire only limited jurisdiction over Indian lands, and only through voluntary compacting at an Indian nation's request. For example, Senator Daniel Inouye stated, "Under this provision, **tribes that choose** to engage in gaming may only do so if they work out a Tribal-State compact with the State." 134 Cong. Rec. 12643 (1988) (emphasis added). Further re-iterated, Senator Daniel Evans explained: "I wish to make it very clear that the committee has only provided for a mechanism to permit the transfer of limited State jurisdiction over Indian lands **where an Indian tribe requests** such as transfer as a part of a Tribal-State gaming compact for class III gaming." *Id*. (emphasis added). Further on, Senator Inouye again said "This section is to be read consistently with the compacting language on pages 60 and 61 of the bill which **makes class III gambling on Indian lands illegal if conducted in the absence of a Tribal-State compact.**" *Id.* (emphasis added). These statements leave no doubt: the choice whether to allow Class III gaming rests exclusively with the Indian nation.

## THE NATIONS' COMPREHENSIVE REGULATION OF GAMING

### A. The Nation's Reservation

34.    In 1794, the United States entered the Treaty of Canandaigua with the Cayuga Nation, and certain other Indian nations in New York, to resolve significant disputes that existed between the United States and those Indian nations. Treaty of Canandaigua, Preamble, 7 Stat. at 44.

35.    In the Treaty of Canandaigua, the United States recognized a federal reservation for the Cayuga Nation comprising 64,015 acres—located within what today are Seneca County, New York (which is located within the federal Western District of New York) and Cayuga County, New York (located within the federal Northern District of New York)—and pledged that the "reservation[] shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase." Treaty of Canandaigua, art. II, 7 Stat. at 45.

36.    In the years following the Treaty of Canandaigua, New York State claimed to enter into two treaties directly with the Cayuga Nation. In 1795, by the Treaty of Cayuga Ferry, the State claimed to acquire the Cayuga Nation's entire Reservation, with the exception of a three square-mile area on the eastern shore of Cayuga Lake, in exchange for a promise to pay the Nation $1,800 annually in perpetuity. In the 1807 Treaty with the Cayugas, the State claimed to purchase the Cayuga Nation's remaining three square-mile parcel for $4,800.

37.    However, because these two treaties with the State of New York "indisputably violated the Non-Intercourse Act, and were never subsequently approved through the federal treaty-ratification procedures," as a matter of law they are void and never "had any effect on the legal status of the Cayuga reservation," which remains fully intact. *Cayuga Indian Nation of N.Y. v. Seneca Cnty.,* 260 F. Supp. 3d 290, 309–10 (W.D.N.Y. 2017) (collecting cases).

10

38.    To this day, Congress has not disestablished the Nation's Reservation, nor authorized the sale of the Nation's reservation lands, *see generally id.* at 307-15 (collecting authorities), and "every federal court that has examined whether the Cayuga reservation was disestablished or diminished by Congress has answered that question in the negative." *Cayuga Indian Nation of N.Y. v. Gould,* 14 N.Y.3d 614, 639 (2010) (collecting cases).

39.    The Nation's 64,015-acre Reservation established by the Treaty of Canandaigua remains fully intact today.

## B.  The Nation's Regulation Of Gaming

40.    Pursuant to IGRA and the Nation's own inherent sovereign authority, the Nation has enacted a gaming Ordinance ("Ordinance"), that has been approved by the Secretary, comprehensively regulating gaming activities on the Nation's Reservation. *See* Cayuga Nation Class II Gaming Ordinance (No. CN-2018-1). The Ordinance establishes a Nation Class II Gaming Commission ("NGC") to regulate the Nation's class II gaming on the Nation's lands.  The NGC exercises oversight to ensure compliance with Nation and federal law, including IGRA and NIGC regulations, has unrestricted access to gaming areas and records, issues facility licenses, and may promulgate regulations necessary to meet applicable internal control standards.  It also inspects, examines, and monitors gaming activities and may hold hearings on patron complaints.

41.    In addition, the Ordinance requires licensing and background investigations for primary management officials and key employees.  The NGC conducts investigations, including fingerprinting through a law enforcement agency, makes eligibility determinations, submits Notices of Results to the NGC, and issues individual licenses if warranted.  The NGC may investigate suspected wrongdoing, maintain exclusion lists, suspend or revoke licenses, and refer potential violations to appropriate law enforcement authorities.

11

42. This Ordinance is the only gaming ordinance approved by the Secretary.

43. The Nation has not entered into a Tribal-State compact to adopt class III gaming on its Reservation. Therefore, no class III gaming, including sports betting, can be lawfully conducted on the Nation's Reservation.

**DEFENDANT'S ILLEGAL GAMBLING ON THE NATION'S RESERVATION**

44. Defendant engaged in unauthorized and illegal gambling on the Nation's Reservation.

45. Upon information and belief, from on or about January 8, 2022 to July 15, 2025, Defendant made sports betting available on the Nation's Reservation, and offering for play to the general public. Such conduct constitutes gaming activity prohibited under IGRA and the Nation's Gaming Ordinance, which authorize only specified forms of gaming conducted under Nation license and oversight absent a Tribal-State compact. Defendant's unauthorized operations therefore violated the Nation's laws and directly interfered with and impaired the Nation's sovereign right to regulate and control gaming within its Reservation.

46. On June 20, 2025, the Nation, through counsel, issued a written cease-and-desist notice to Defendant directing it to immediately discontinue all gaming activity being conducted on the Nation's Reservation.

47. On July 15, 2025, Caesars responded that it agreed to geofence its operations out of the Reservation.

48. On September 2, 2025, the Nation, through counsel, requested that Defendant provide a full accounting of all gaming activity conducted within the Reservation, including all wagers accepted and revenues derived therefrom, and requested that Defendant respond by September 19, 2025.

49.     On October 14, 2025, Caesars, through counsel, confirmed that it had agreed to geofence its operations out of the Reservation but refused to provide an accounting of the proceeds it generated from operating on the Reservation.

50.     The Nation has suffered monetary damages as a result of Defendant's unauthorized gaming activity during the period of operation. Such damages include, but are not limited to, the loss of gaming revenue, interference with the Nation's exclusive right to regulate and benefit from gaming on its Reservation, and resulting harm to governmental programs and services funded by that revenue.

## DEFENDANT'S FALSE AND MISLEADING ADVERTISING

51.     Defendant actively promotes its products, including its sports betting on the internet and social media platforms.

52.     On its website, Defendant holds itself out as a fully compliant, law-abiding operator by repeatedly referencing the New York State Gaming Commission's regulatory framework and emphasizing that sports betting in New York is "safe, fun, and entertaining" under state oversight. Defendant further highlights responsible-gaming measures as evidence that its operations strictly comply with New York law.

53.     By emphasizing its adherence to state regulations while omitting any disclosure that mobile sports wagering may be unlawful on Indian lands, Defendant creates the misleading impression that its platform is legally available everywhere within the State, without geographic restriction. Defendant's advertising does not advise consumers that IGRA prohibits Class III gaming on Indian lands absent a Tribal–State compact, that no such compact exists here, or that its New York license does not authorize mobile sports betting within the Nation's Reservation.

54.     Defendant's omission of this critical legal limitation misleads consumers into believing that its sportsbook is lawfully available throughout the entirety of New York and encourages wagering from within the Nation's sovereign territory in violation of federal law and the Nation's Gaming Ordinance.

## FIRST CAUSE OF ACTION

### (Violation of the Indian Gaming Regulatory Act and 18 U.S.C. § 1166)

55.     The Nation realleges each of the allegations set forth in Paragraphs 1 through 37 above and by this reference incorporates each allegation as if set forth herein in full.

56.     Gaming in Indian country is criminally prohibited by federal statute, except gaming conducted by a federally recognized Indian nation in accordance with IGRA. 18 U.S.C. § 1166.

57.     IGRA established a statutory framework for the regulation of Indian gaming that expressly preempts the field of governance of gaming activities on Indian lands, including the application of any state gaming laws, except as expressly authorized through a valid Tribal-State compact.

58.     Under IGRA, in order for class III gaming to be conducted on Indian lands: (1) the nation must have adopted a tribal ordinance that authorizes the playing of the class III games and the ordinance must have been approved by the Chairman of the National Indian Gaming Commission ("NIGC"), a federal regulatory agency created under IGRA; (2) the state in which the class III gaming will be conducted must "permit" such gaming for any purpose by any person, organization, or entity; and (3) the class III gaming must be conducted in conformance with a Tribal-State compact entered into by the Indian nation and the state, pursuant to IGRA. 25 U.S.C. § 2710(d)(1).

59.     In order to go into effect, a Tribal-State class III gaming compact must be approved by the Secretary, 25 U.S.C. § 2710(d)(8)(A), or deemed approved by operation of law, 25 U.S.C.

14

§ 2710(d)(8)(C), and notice of approval must be published in the Federal Register. 25 U.S.C. § 2710(d)(3)(B).

60.    Federal regulations implementing IGRA define "gaming activity" or "gaming activities" as "the conduct of class III gaming involving the three required elements of chance, consideration, and prize or reward." 25 C.F.R. § 293.2(d).

61.    Federal regulations further specify that class III gaming includes "[a]ny sports betting and parimutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai." 25 C.F.R. § 502.4(c).

62.    Defendant is not a federally-recognized Indian nation and is not conducting class III gaming activity pursuant to a valid Tribal-State compact, 25 U.S.C. §§ 2710(d)(1)–(2), or Secretarial Procedures. 25 U.S.C. § 2710(d)(7)(B)(vii).

63.    Therefore, no class III gaming can be lawfully conducted on the Nation's Reservation.

64.    Defendant's operation of gaming on the Reservation violates IGRA.

65.    As a direct and proximate result of Defendant's unlawful gaming activity on the Reservation, the Nation has sustained injury, including but not limited to monetary damages, loss of gaming-related revenue, and interference with the Nation's sovereign right to exclusively regulate and benefit from gaming conducted on its Reservation.

## SECOND CAUSE OF ACTION

### (Violation of the Nation's Ordinance)

66.    The Nation realleges each of the allegations set forth in Paragraphs 1 through 48 above and by this reference incorporates each allegation as if set forth herein in full.

15

67.     The Nation is a sovereign governmental entity that exercises inherent powers of self-government with the jurisdiction and authority to enact its own laws and enforce those laws against both Indians and non-Indians engaging in activities on its Reservations.

68.     In enacting IGRA, Congress expressly granted the Nation the right to regulate gaming activities on its Reservation through the enactment of ordinances.

69.     Pursuant to IGRA and the Nation's inherent sovereign authority, the Nation enacted ordinances that comprehensively regulate all gaming activities on its Reservation.  The enactment of gaming ordinances was not only an exercise of the Nation's own inherent sovereign authority, but also an exercise of congressionally delegated authority granted to the Nation by Congress with the enactment of IGRA.

70.     As such, the Nation's gaming ordinances preempt the field of gaming conduct, including any other federal or state law that conflicts with the express provisions of the ordinances authorized by IGRA.

71.     The Nation does not authorize any class III gaming activities without a valid Tribal-State compact.  Accordingly, class III gaming activities are not permitted to occur on the Reservation unless and until expressly authorized in accordance with IGRA and applicable federal law.

72.     Defendant's gaming activities constitute class III gaming within the meaning of IGRA and therefore fall within the category of gaming expressly prohibited under the Nation's Ordinance.

73.     Pursuant to the Nation's inherent sovereign authority and congressionally delegated authority granted to the Nation by IGRA, the Nation has jurisdiction to enforce the provisions of its Ordinance against the Defendant, including prohibiting Defendant from engaging in gaming on its Reservation.

74.     As a direct and proximate result of Defendant's unlawful gaming activity on the Reservation, the Nation has sustained injury, including but not limited to monetary damages, loss of gaming-related revenue, and interference with the Nation's sovereign right to exclusively regulate and benefit from gaming conducted on its Reservation.

## THIRD CAUSE OF ACTION

### (Infringement of the Nation's Sovereignty and Interference with Tribal Self-Governance)

75.     The Nation realleges each of the allegations set forth in Paragraphs 1 through 57 above and by this reference incorporates each allegation as if set forth herein in full.

76.     By engaging in illegal gaming absent a Tribal-State compact allowing Class III gaming, the Defendant interfered with the Nation's ability to govern itself, its members, and all persons who work, live, and visit its Reservation by preventing the Nation from determining to what extent and under what conditions, if any, persons, organizations, and entities can engage in class III gaming on its Reservation.

77.     As a direct and proximate result of Defendant's unlawful gaming activity on the Reservation, the Nation has sustained injury, including but not limited to monetary damages, loss of gaming-related revenue, and interference with the Nation's sovereign right to exclusively regulate and benefit from gaming conducted on its Reservation.

## FOURTH CAUSE OF ACTION

### (False Advertising – Lanham Act, 15 U.S.C. § 1125(a)(1)(B))

78.     The Nation realleges each of the allegations set forth in Paragraphs 1 through 60 above and by this reference incorporates each allegation as if set forth herein in full.

79.     The following five elements must be established by a plaintiff in order to make out a claim for false or deceptive advertising on the part of a defendant: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

17

80.    The Defendant has made multiple false and misleading statements of fact concerning the legality of its mobile betting operations. These include statements to consumers that Defendant's sports betting operations are fully legal in New York State.

81.    The Defendant knew, or should have known, that its advertising was false, misleading, and deceptive.

82.    Each of these false or misleading statements was made in the context of Defendant's own websites, distributed across the Internet and designed to promote purchasing of Defendant's operations to consumers in New York State.  Statements made in these advertisements have deceived, and are still likely to deceive, consumers into believing that Defendant can fully legally operate in all of New York State, including the Indian Reservations.

83.    Defendant's deception is material, as it is likely to cause a consumer to purchase Defendant's products, believing its products were universally compliant and that Defendant was a legally compliant betting platform.

84.    As a result of Defendant's false and misleading statements, Plaintiff has suffered damages through lost sales and lost profits of its Class II businesses, as well as continuing damage to Plaintiff's business, goodwill, and reputation.

85.    Furthermore, under 15 U.S.C. § 1117(a), Plaintiff is entitled to recover Defendant's profits on its operations in the Reservation, any damages sustained by the Plaintiff, and the costs of the action, ensuring that Defendant does not benefit from its unlawful conduct.

## **PRAYER FOR RELIEF**

**WHEREFORE**, in accordance with the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the general principles of equity, and pursuant to the claims and causes of action set forth herein, the Cayuga Nation respectfully prays that this Court enter judgment in its favor and grant the following relief:

A.    A declaration that Defendant's gaming activity conducted within the Nation's Reservation constitutes illegal class III gaming in violation of 18 U.S.C. § 1166 and the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq.;

B.    A declaration that Defendant's gambling activities on the Nation's Reservation violated the Nation's sovereign right to govern itself and regulate gaming under its own laws;

C.    An order requiring Defendant to provide a full accounting of all revenues derived from its unauthorized gaming activities on the Reservation and awarding the Nation damages, including but not limited to disgorgement of ill-gotten gains, lost profits, costs, and attorneys' fees, as permitted by 15 U.S.C. § 1117(a), and such other monetary relief as the Court deems just and proper;

D.    All costs and fees allowed by law, including attorneys' fees where authorized; and

E.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to the Federal Rules of Civil Procedure 38(b), the Nation respectfully demands a trial by jury of all issues triable by a jury.

**Dated:** June 16, 2026

**BARCLAY DAMON LLP**

By:    */s/ Jennifer J. Hopkins*
       David G. Burch, Jr.
       Jennifer J. Hopkins

125 East Jefferson Avenue
Syracuse, New York 13202
Tel: (315) 425-2788
dburch@barclaydamon.com
jhopkins@barclaydamon.com
*Attorneys for Plaintiff Cayuga Nation*

19